WILLIAM B. ROSS *vs.* ALONZO W. ADAMS AND CATHARINE HIS WIFE AND OTHERS.

1. Where land has been condemned under the provisions of the Erie Railroad charter, and the money paid into court, the money, as between those having an interest in the land, represents the whole fee simple, and

should be disposed of among them as nearly as possible as if it were the land itself.

2. Where husband and wife had executed a mortgage upon the land before it was so condemned, the wife being at the time under age, the wife, by coming in and claiming the money at the first opportunity after she comes of age, and while the money is still in court, avoids the mortgage so far as her interest is concerned.

3. Where the land was conveyed to the wife after marriage, and after the passage of the act for the better securing of the property of married women, (*Nix. Dig.* 466) and before it was condemned, the husband has no present interest in the land or the money.

4. By the term *grant*, in the above mentioned statute, the legislature intended all the ordinary modes of acquiring land by deed.

5. If the wife, by force of the conveyance, had an estate either in fee or in tail and issue of the marriage before the condemnation, the husband, notwithstanding said act, became tenant by the curtesy initial.

6. Where a deed, dated September 9th, 1854, purporting to be made between A. T., party of the first part, and C. A., wife of A. A., party of the second part, in consideration of natural love and affection and of one dollar, and to grant, bargain, and sell unto the said party of the second part for and during her natural life, and at her death to her children which may be begotten of her present husband, the lands condemned, to have and to hold the same unto the said party of the second part for and during her natural life, and at her death to her children which may be begotten of her present husband, and the deed is in all other respects in the ordinary form of a deed in fee simple with full covenants as of a deed in fee simple, and at the date and delivery of the deed there were *no children born of the marriage*, but were afterwards, the estate thereby conveyed to the wife was a fee tail special.

7. The covenants cannot enlarge the estate to a fee simple.

8. Although the covenants cannot be used to enlarge the estate, yet they may be used to show in what sense the words in the conveying part of the deed were intended to translate the term children.

9. It never was the intention of the elementary writers to say that in a deed no estate of inheritance could be created by any other word or form of expression than the word heirs, or by the sound represented by that construction of letters, but only that such language should be used as made it appear that it was meant to include the line of inheritance.

10. Under this deed the interest of the children born of the marriage is a remainder in fee, and vests at their birth.

---

## On application for money paid into court.

This cause was argued at June term, 1858, before Justices OGDEN, RYERSON, and VREDENBURGH

o*

*A. C. M. Pennington*, for the applicant.

*J. F. Randolph*, for Alonzo W. Adams.

*A. O. Zabriskie*, for Anna V. B. Traphagen and others.

The facts sufficiently appear in the opinion of the court, delivered by

VREDENBURGH, J. The Erie Railroad Company, in 1856, took, under the provisions of their charter, the west half of lots No. 1, 2, 3, and 4, of block 159, on Mangin's map of Jersey City. The jury assessed their value at $3061, which has been brought into this court. The charter vests the entire interest in the land in the company. This money represents the whole fee simple.

The applicant claims to have the whole of this money paid over to him. This is resisted by Miss Traphagen, Mr. and Mrs. Adams, and in behalf of the minor children of Mr. and Mrs. Adams, who all claim to have held different interests in the land. This money represents the land, and it is manifest that we should dispose of it, as nearly as possible, as if it were the land itself.

*First.* As to the claim of Mr. Ross. In its support he shows that, at and prior to the 9th of September, 1854, the land belonged in fee to Miss Traphagen ; that she, on that day, made a deed of bargain and sale, or a covenant to stand-seized to uses to said Mrs. Adams, as he contends, in fee, and that Mrs. Adams and her husband, on the 12th October, 1855, gave a mortgage on this property, duly acknowledged to him, for $6000. The validity of this mortgage is contested upon the admitted ground, that at its date Mrs. Adams was a *feme covert* and under age.

First, what interest was conveyed to Ross by virtue of Mrs. Adams's execution of the mortgage?

There can be no doubt but that at the common law the deed of a married woman was absolutely void, so much so that she could plead to it *non est factum.* *Rake* v. *Lawshee*,

4 *Zab.* 613; *Moore* v. *Rake*, 2 *Dutcher* 577. It never was a case like mere infancy, where the title passed, but could be avoided by matters subsequent. Nor is this disability removed by the statute (*Nix. Dig.* 122, § 4), authorizing the acknowledgment of deeds by married women, because the power conferred by that act is, by its express terms limited to *femes covert* over age.

But even supposing, as Mr. Ross contends, that this mortgage is not void, but only voidable, still she is represented by counsel claiming now here to avoid this mortgage. This is the first and only time and place she has had an opportunity so to do, and if not allowed now by us, the right is gone for ever. We think, by her coming forward on this occasion, and claiming the money at our hands, she, so far as her rights are concerned, avoids the mortgage, and that consequently Mr. Ross has no rights in this land by virtue of its execution by her.

*Second.* The next question is, what rights did Mr. Ross acquire by reason of Mr. Adams' execution of the mortgage?

Without inquiring now what was Mrs. Adams' interest in the land under the deed from Miss Traphagen, had Mr. Adams, at the date of the mortgage, any present right to the rents and profits, so as to entitle him to the interest of this money during the lifetime of his wife? The deed from Miss Traphagen is dated the 9th September, 1854. He would have been entitled to the rents and profits as husband during his life, if his wife's interest lasted so long, but for the operation of the act for the better securing of the property of married women, passed March 25th, 1852, *Nix. Dig.* 466. This act being in force when the deed was made by Miss Traphagen to Mrs. Adams, Mr. Adams' interest is subject to its operation.

Does this act so alter the common law as to take away from the husband all interest during his wife's life in lands conveyed to her by deed of bargain and sale, or by a covenant to stand seized to uses? The third section of this

act, the only one applicable to the case before us, provides that "it shall be lawful for any married female to receive, by gift, grant, devise, or bequest, and hold to her sole and separate use, as if she were a single female, real and personal property, and the rents, issues, and profits thereof, and the same shall not be subject to the disposal of her husband, nor be liable to his debts." Mrs. Adams married, and acquired her interest in this land, *after* the passage of this statute, by a deed from Miss Traphagen, in consideration of natural love and affection and of one dollar.

This act applies only to land received by the wife by gift, grant, devise, or bequest.

This was certainly not a devise or bequest. The only question is, was this deed a gift or grant within the meaning of the legislature.

It is contended, by Mr. Ross, that the legislature intended to use the terms gift and grant in the strict technical sense, and that the conveyance here is one of bargain and sale, or a covenant to stand seized to uses, operating by virtue of the statute of uses, and not either a gift or grant.

But did the legislature intend to use these terms, *gift* or *grant*, in their narrowest technical sense. I think not, but to embrace in the terms gift and grant, devise or bequest, all the modes of acquiring property, except perhaps by descent. This language is used by the legislature in 1852. Gift and grant had then long ceased to be understood, even by the profession, and in all ordinary instruments, even such as deeds, in their ancient technical meaning. In practice for many years, females as well as others had ceased receiving lands by the strict technical forms of gift or grant. It cannot be intended that the legislature meant to restrict the rights of married women to lands received in a mode which had fallen into disuse.

In the state of New York, the term grant had for many years, technically as well as in common language, included all modes of acquiring lands by deed or conveyance.

It is true that there this was done by special statute. But still this had only the more strongly fixed this meaning in the public mind.

The Vermont statute provides, that any rights in real estate which a *feme covert* may acquire, by gift, grant, devise, or inheritance, during coverture, shall not be liable for the debts of the husband.

These words, gift or grant, came up for construction in the case of *Peck* v. *Walter*, 26 *Verm. Rep.* 85, wherein Redfield, Chief Justice, in delivering the opinion of the court, says : " It is very apparent that the statute was intended to embrace all rights in real estate which the wife shall acquire during coverture. It would be a very nice, and, as it appears to me, a very unintelligible construction of this statute to limit the word grant to its narrowest technical import. It evidently was intended to apply to all conveyances by deed which were not gifts." That case was, like the present, a mortgage of the wife's property by the husband, the wife not joining.

In our statute, by the term grant, the legislature intended all the ordinary modes of acquiring property by deed, whether operating by force of the statute of uses or not ; that by long usage such had become not only the popular, but also the technical meaning of the term.

It follows, that at the time of the execution of this mortgage by Mr. Adams, he had no present interest in this land which he could convey.

The next question is, had Mr. Adams, when he executed this mortgage, any future or contingent interest which would pass by the mortgage, and give Mr. Ross any future interest in this money ?

This depends upon whether Mr. Adams was tenant by the curtesy inchoate. There are children born of the marriage.

This brings us to the question, what estate Miss Adams had in this land by virtue of the deed from Miss Traphagen ?

If she had only a life estate, then Mr. Adams never could be tenant by the curtesy, and consequently Mr. Ross never had any interest in this money. But if Mrs. Adams had an estate either in fee or in tail, then it is contended that, notwithstanding the act for the better security of married women, Mr. Adams was tenant by the curtesy initiate.

The deed is dated September 9th, 1854, and purports to be made between Miss Traphagen, party of the first part, and Catharine Adams, wife of Alonzo Adams, party of the second part, in consideration of natural love and affection and of one dollar, and to grant, bargain, sell, alien, remise, release, convey, and confirm unto the said party of the second part, for and during her natural life, and at her death to her children which may be begotten of her present husband, the said lots (describing them by numbers and bounds), together with all the appurtnances, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof, and also all the estate, right, title, interest, property, possession, claim, and demand whatsoever, as well in law as in equity, of the said party of the first part of, in, and to the same; to have and to hold the above described premises unto the said party of the second part for and during her natural life, and at her death to her children which may be begotten of her present husband, Alonzo Adams.

Then follows—1st. A covenant by Miss Traphagen, for herself and heirs, with the said party of the second part and her heirs and assigns, of seizin and of full power to convey in manner aforesaid.

2d. That the said party of the second part, her heirs and assigns, may at all times hereafter peaceably and quietly hold the premises without any let, suit, trouble, molestation, eviction, or disturbance of the said party of the first part, her heirs or assigns, or of any other person lawfully claiming.

3d. That they are free from encumbrance.

4th. That the said party of the first part and her heirs, and all persons claiming under them, shall and will, at any time or times hereafter, upon the request of the party of the second part, her heirs and assigns, make all such further conveyances for the better vesting and confirming the said premises in and to the said part of the second part, her heirs and assigns for ever, as by the said party of the second part, her heirs or assigns, shall be reasonably required.

5th. That the said Traphagen and her heirs, the said premises unto the said party of the second part, her heirs and assigns, against the said party of the first part and her heirs, and against all persons whomsoever lawfully claiming, shall and will warrant, and forever defend.

Upon the construction of this deed, Mr. Ross contends that it conveys to Mrs. Adams either an estate in fee simple or in fee tail, and that he consequently is entitled, as representing Mr. Adams, to the interest of this money after her death during the life of Mr. Adams, if he survives her. It is contended, on behalf of Mrs. Adams, that the deed gives her a fee simple, and that she is entitled to all the money. It is contended, on behalf of the children of Mrs. Adams, that the deed gives her only a life estate, or at most a fee tail, and that they are entitled to the money after her death; and it is finally contended, by Miss Traphagen, that the deed only conveys a life estate to Mrs. Adams, and at most, after her death only, a life estate to her children, and that the money goes, after her and their deaths, back to Miss Traphagen.

Upon the construction of this deed, I am of opinion that the estate thereby conveyed to Mrs. Adams was a fee tail special, as if the language had been, to Mrs. Adams and the heirs of her body by her present husband to be begotten. That by the term children which may be begotten of her present husband, the grantor meant, and that the law will so construe it, heirs which may be begotten of her present husband.

No one can for a moment doubt, upon reading this deed, that it was the intent of the grantor that it should belong to Mrs. Adams during her life, and after her death absolutely to her children. Are we forced by any strict principles of law to defeat this intent? In the first place, suppose the deed had used the word heirs, instead of the word children, the deed would then have read to Mrs. Adams for and during her natural life, and at her death to her heirs which may be begotten of her present husband. It has never been a question, from the time of Shelly's case, that this would have given Mrs. Adams a fee tail special; that the words during her life, did not make it a life estate, or change the estate from what it would have been if the language had been to Mrs. Adams and to her heirs of her body by her present husband. Inserting the words "during her life" gave her nothing more or less than she would have had without them.

Are we prohibited, by unyielding principles of law, from giving effect to what the whole document and the nature of the transaction shows to have been the intention of the grantor?

In the first place, the estate conveyed to Mrs. Adams in not a fee simple. The words of conveyance are, to Mrs. Adams during her natural life, and after her death to her children by her husband. This expressly limits the estate to less than a fee simple.

It is contended that, by the covenants, it is warranted to her and her heirs generally. But the covenants cannot be used to enlarge the estate. They only defend the estate granted, whatever that may be, except so far as the general warranty may operate by way of estoppel, of which we shall speak hereafter.

Nor is the estate granted changed by calling this conveyance a covenant to stand seized of uses. The covenant in this deed would have the same effect if we call it a covenant to stand seized to uses, as if we call it a bargain and sale. These covenants, if the conveyance is a coven-

ant to stand seized to uses would only warrant and defend the uses declared—they could not enlarge the uses. If we strike out of this conveyance the pecuniary consideration, it would then be technically a covenant to stand seized to uses ; if we strike out the consideration of love and affection, it is then a deed of bargain and sale, and we may call it, as it is, either the one or the other, or both, as may best effect the intent of the parties. But the quantity of estate conveyed, in either case, must depend upon the operative words of conveyance or the declarations of the use, and not upon the covenant defending the quantity of estate conveyed.

The only remaining question is, does this conveyance give Mrs. Adams an estate for life or an estate in fee tail special ?

If the deed, instead of saying to Mrs. Adams during her natural life, and after her death to her children by her present husband, had said to Mrs. Adams during her natural life, and at her death to her heirs by her present husband, there can be no doubt but that her estate would have been a fee tail special. The whole difficulty arises from using in the terms of grant the word children, instead of the word heirs.

It is contended, in behalf of the children, that although the grantor used the word children, yet that she by that term meant heirs, and that the legal construction of the deed is to read it as if she had used that term.

1st. By the term children, did she mean heirs ?

In the first place, under our statute of descents, the term children by her present husband, is identical in legal effect with the term heirs of her body by her present husband, and designates the same objects. It is not here as it would be under the law of primogeniture, where the oldest male only would be heir. Her heirs by her present husband must be her children, and her children must be her heirs. In the next place, the children are not parties to the deed. They had not then yet been born.

In the next place, although the covenants cannot be used to enlarge the estate, yet they may be used to show in what s.nse the words in the conveying part of the deed were intended.

From these covenants it is demonstrated that, by the term children by her present husband, the grantor intended the heirs of her body by her present husband.

Thus the grantor covenants that the party of the second part and her heirs shall at all times hereafter peaceably occupy and hold the premises. She could not intend, by this covenant, that heirs general should enjoy it, but only those who would take under the operative words of conveyance, and that she used the word children by her present husband for, and really meant by it, the heirs of her body by her present husband. So also to the covenant for other assurance; so also with respect to the clause of general warranty.

The covenants are intended not to enlarge but to defend the quantity of estate conveyed. The covenants have reference, consequently, to the words of conveyance, and they are to be construed together. By the term children, in the conveying part, she includes certain heirs, and by the term heirs, in the covenants, those heirs which are children by her present husband. By the covenants she defends the estate to all the heirs in terms, but which heirs she meant is defined in the conveying clause to be children by her present husband.

The very nature of the transaction shows that it could not have been the intent that, if Mrs. Adams had children by her present husband, the property should revert, at the deaths of those children at some remote period, to Miss Traphagen, but that, under our statute regulating estates tail, the property would vest in the children in fee immediately at their birth.

Such being the undoubted intention of the grantor, are we forced to defeat this intent, and say that the term children was only intended to be a *designatio personœ* ?

There can be no doubt if this had been a will, and it had appeared by the context clearly that the testator by the term children meant heirs, that the courts would have given effect to the intention.

Is it otherwise with respect to deeds?

2 *Blackstone* 107, says the word "heirs" is necessary in a grant or donation in order to make a fee or inheritance. For if land be given to a man for ever, or to him and his assigns for ever, this vests in him, but an estate for life. This very great nicety about the insertion of the word heirs is a relic of feudal strictness, by which it was required that the form of the donation should be strictly preserved. The personal abilities of the donee were originally supposed to be the only inducement to the gift, and subsisted only for the life of the donee, unless the contrary were clearly expressed. But this rule is now softened by many exceptions.

The reasons of the rule have long since ceased, and with it also ought to cease the law. Conveyances have long since ceased to be looked upon as gifts.

But it is apparent from the passage, that by it was not meant that there existed any magic in the word heirs or in the sound represented by that combination of letters. Otherwise no deed in a foreign language could convey a fee. But the writer merely means to say, that in a grant to make a fee the grantor must use language by which it appears that he meant to include the line of inheritance, of which the word heirs was the most apt and well defined expression. But he does not intend to say that any other language, by which it clearly appears that the grantor intended to embrace the line of inheritance in the grant, will not pass a fee.

If the word heirs is used, that *prima facie* carries the fee, unless the contrary expressly appears; if the term children is used, it must clearly appear from the instrument that the grantor did not mean by that term certain individuals, but the same thing as heirs or the entire line of

descent.    But the term children, like the Latin *hæres*, or any term in a foreign language, is capable of translation, and the grantor has the right in the instrument creating the grant to translate his own language.    It is a question of translation.

The rule is, that it must appear upon the face of the instrument that the grantor intends to pass the inheritance, which may be done best by the terms heirs, but may be equally done by any sound or word or phrase which the instrument shows the grantor used as a synonym for it.    Thus the word successors, in a grant of land to a sole corporation, carries the fee, because it shows the intention of the grantor to convey the inheritance.

Thus Mr. Hays, in his principles for expounding dispositions of real estate, 7 *Law Library* 77, remarks : " That the rules of construction freely permit the use of the words heirs of the body or issue in the limited sense of children, and the word children in the comprehensive sense of the words ' heirs of the body.'    Those rules, or rather the fundamental principles of legal interpretation, require only a clear explanation to justify a departure from the ordinary meaning, imposing on those who would translate the term the *onus* of producing an express warrant under the hand of the author of the gift."

So in his 8th proposition, developing the principles on which the construction of gifts to heirs special depend, the same author remarks : " It is immaterial, with reference to the preceding propositions, whether their heirs special are described under the technical denomination of heirs of the body, or under the informal denomination of heir of the body, issue, descendants, son, sons, children, for all these may be used as synonymous with heirs in tail, or any other term apparently designed to comprehend the whole line of succession.    The rule does not speak of the word heirs abstractedly, nor suppose any special virtue to reside in that word ; but when, by the application of the ordinary rules of interpretation, the testator

is found to have used a term which though properly a word of purchase, or of an ambiguous character, yet taken in connection with the context, is of as large import as heirs of the body standing unexplained, it follows that he has indicated that course and mode of succession which the writers on the rule have so anxiously marked as attracting and requiring its application.

2 *Preston on Estates* 1, says: " to the creation of an estate in fee by deed, it is requisite that the land should be limited to an individual and his heirs, but that many exceptions are to be noticed. Thus the word heirs need not be in the grant at all, as where one grants land to another as fully as they were granted to him ; or where one enfeoffs another, and it is re-enfeoffed in the following language : you have given me these lands ; as fully as you have given them to me, I assure them to you." These authorities show that the fee passes not because the word heir is in the deed, but because it appears by reference that it was the intention of the grantor to include the whole line of descent in the grant.

So in p. 7, the same author, quoting 3 *Buls.* 128, remarks : " it will be sufficient that it should appear from the context that the grantee and his heirs are to have the benefit of the grant. Thus where a grant was of rent to A., and afterwards that he and his heirs should distrain for it, this limitation of distress enlarged the estate, and made it a fee simple."

So it p. 47, speaking of estates tail, he says : " words of reference will be sufficient to create an estate tail, therefore a gift to A. and the heirs of his body, remainder to B., in *eadem forma*, gives B. an estate tail. So where a gift is made in frank marriage." Again, the author says, an estate tail even in a deed may, contrary to the general rule of law, arise from necessary implication. Thus a gift to a man without any limitation to his heirs, but with a provision that the land shall revert to the donor, or remain to another if the donee shall die without heirs of

P*

his body, will afford ground for the construction that the donee is to have the land to him and the heirs of his body, because the land is not to revert or remain over until there shall be a failure of these heirs.    And as Perkins, and, after him, Chief Justice Holt, states the reason to be *quod voluntas donatoris secundam formam in certa doni sui manifeste expressa de cetero observetur.*    The true reason is, that the intent of the donor appeared in express words in the deed, and the implication was a necessary one.    Again, in page 484, the author says : It is sufficient in creating an estate tail that the words of the clause of limitation or *some part of the deed that refers to the clause or explains it*, or a reference by this clause to some other part of the same deed, or even to a distinct instrument, should confine the gift to the heirs of the body of the donee.    It is not by the rule of law prescribed that the qualification of the gift should, in direct words or by express terms, be in the immediate clause of the gift to the donee.    All that is required is that, by the frame and context of the deed, the gift should be restrained to the heirs of the body, and not extended to the heirs generally.    The point depends on the rule, that all the clauses included are to be taken into consideration together, and construction made on the several parts.    The entire instrument must be construed by its parts, so that every clause, and every word in every clause, may have effect.    Whenever it is to be collected in construction on the clause of immediate gift, or from a clause which introduces the limitation of another estate, or refers to another part of the same instrument, or to another instrument, that the gift under consideration is not to extend the benefit of the limitation to any heirs besides those which are of the body of the devisee, the word heirs will be restrained to mean heirs of the body.

Now, construing this deed upon these principles, is it not apparent, and a necessary implication from the different clauses of the deed itself, first, that it was the intention to grant an estate to Mrs. Adams and her heirs, and

in the second place, that those heirs were the heirs of her body by her present husband?

Take, for instance, the second covenant: the grantor therein, for herself and her heirs, covenants with Mrs. Adams and her heirs that the party of the second part and her heirs shall for ever quietly hold the premises. And so of the other covenants.

As the covenant is only intended to defend the estate granted, is it not a necessary implication that the grantor intended to use in the granting clause words that would create in the grantee an estate of inheritance, and the object of the covenant was to defend that inheritance? The words in the granting clause and in the covenant have direct reference to each other, and mutually translate each other. The children by her husband were her heirs.

Using the term heirs in the covenant shows that by children, in the granting clause, was intended heirs, and the term children, in the granting clause, shows that by the term heirs, in the covenant, was intended heirs of her body by her present husband.

In the case of *Parkman* v. *Bowdoin*, 1 *Sumner's Rep.* 359, the language of the will was, " I give the land to my son James and his lawful begotten children in fee simple for ever; but in case he should die without children lawfully begotten, to my son A. and to his lawfully begotten children in fee simple for ever." At the time of making this will James had no children. It was held that James took an estate tail. Judge Story, in giving his opinion, says the devise must be construed as meaning heirs of the body.

Numerous cases are referred to by him where children in devises have been construed to mean heirs of the body. It is true that these are cases of devises, but I cite them as showing that, in legal language, children may be construed as meaning heirs of the body. Here the term children is defined and demonstrated by the covenants to mean heirs of the body, by necessary implication from

the covenants and by the direct reference of the covenants to the words of grant. Even if the word heirs must be in a deed, no authority prescribes that they can be only in the granting clause. The whole deed and all its parts are to be construed together to give to the term heirs, wherever found in the instrument, their proper force.

In *Mills* v. *Carter*, 22 *Verm. Rep.* 104, the court remarks, that though it may be true that the covenants in a deed may not enlarge the estate, yet when it becomes a question of construction as to what is granted, they may well be resorted to to help the construction, and this upon the principle that reference is to be had to the whole deed, and that every part is to have operation, if possible.

But again, in *Terrill* v. *Taylor*, 9 *Cranch* 57, Story, in delivering the opinion of the court, says, the present deed did not operate by way of grant to convey the fee; for the term heirs is not in the deed, but the covenant of general warranty binding the grantors and their heirs, and warranting the land to the church wardens and their successors for ever (who could not hold lands) may well operate by way of estoppel to confirm to the church and its grantees the beneficial estate in the land.

The case of *Shaw* v. *Galbraith*, 7 *Barr*. 111, was one upon a deed like the present, without words of inheritance in the granting clause, but containing the clause of general warranty to the grantee, his heirs and assigns. The court, in delivering their opinion, say, that without undertaking to determine whether the fee simple is trans ferred, we are of opinion the grantor is estopped from denying the title.

It is well settled that a general warranty operating by estoppel passes the estate. If this be so, the general warranty in this deed passed the estate by virtue of the term heirs in a covenant to Mrs. Adams and her heirs. But what heirs? Not her heirs general, for that would be against the express language of the clause and grant, but

by every rule of construction the term heirs, in the covenant, would be limited to those heirs named in the granting clause, to wit, her children by her present husband. The heirs named in the covenant must mean and be restricted to the heirs of her body by her present husband, and this would give a fee tail special to Mrs. Adams.

I confess myself at a loss to put any other construction upon this deed. If we call the estate of Mrs. Adams a fee simple, we must reject the words during her life, and after her death to her children, in fact the whole clause of conveyance; if we call it a life estate, we must strike out the word heirs in all the covenants. But if we decide that the covenants and the clause of conveyance refer to, explain, and construe each other, and that the estate is a fee tail, all its parts harmonize, and the intention of the instrument manifestly carried out, the wife gets her life estate, the husband his inchoate curtesy, and the children the inheritance.

It was urged, upon the argument in behalf of Mr. Ross, that Mrs. Adams, under this deed, had the fee simple; but in the view we have taken of the case, this inquiry is immaterial as regards him, as he takes precisely the same interest whether Mrs. Adams has an estate in fee or in tail, he being in either case tenant by the curtesy initiate.

But the question becomes material as between Mrs. Adams, her children, and Miss Traphagen.

It was contended, on behalf of Mrs. Adams, that the deed gave her a fee simple because this was void as to the children on account of its being a deed of bargain and sale, and they not being in existence at the date of the deed, and so no pecuniary consideration could move from them, and the clause of conveyance gave it to her during her natural life, and also all the remainders and reversions, and that she takes all after her life as a remainder. But these terms are no broader than to say, to her for ever. It would still be but a life estate for want of words of inheritance.

It is contended, in behalf of Miss Traphagen, that considering this deed as one of bargain and sale, Mrs. Adams has only a life estate, and the children of Mrs. Adams take as purchasers ; and that as none of them were born at the date of the deed, it is void, as to them, for want of consideration moving from them. But if we are right in the conclusion, that under this deed the estate of Mrs. Adams is a fee tail special, then this question cannot arise, because then the children would hold by descent, and not as purchasers.

Again, it is said, by Miss Traphagen, that considering this deed as a covenant to stand seized to uses, it, in the first place, is void entirely, because Mrs. Adams was too remotely connected to raise the consideration of blood or marriage. However this may be, this deed is undoubtedly good as a deed of bargain and sale, and if by it a fee tail is vested in Mrs. Adams, it makes no difference whether it will operate as a covenant to stand seized.

Upon the whole case, then, we conclude that this deed is a conveyance whereby the grantee, Mrs. Adams, became seized in law of such an estate in the lands thereby conveyed as under the statute of 13th Edward the first, called the statute of entail, is an estate in fee tail, and that consequently upon her death, under our statute (Nix. Dig. 196, § 11), the lands go to and will be vested in the children of Mr. Adams in fee.

One more question is raised by Miss Traphagen. She contends that all the issue of Mrs. Adams may die before their mother, and that in that event the reversion is in her. But it appears, by the case, that Mrs. Adams had children before this land was condemned for the railroad company. This section of the act provides that upon the death of the tenant in tail the lands shall go to and be vested in the children of such grantee, and if any child be dead, the part which would come to him or her shall go to his or her issue in like manner. This language is identical with that of the 10th section of the same act,

providing in case any lands shall hereafter be devised to any person for life, and at his death to go to his heirs, then upon the death of his devisee the lands shall go to and be vested in the children of such devisee in fee, and if any child be dead, the part which would come to him to go to his issue.

The question is, whether, under the language of these sections, the estate of the children vest at their birth or at the death of the parent. The language of the 10th section has received the judicial construction by the Court of Appeals of this state in the case of *Den* v. *Hopper*, 2 *Zab.* 599, wherein that court decided that, within the 10th section, the children took vested estates at their birth, subject to be defeated only so far as to let in subsequently born children. I can see no difference, in this respect, between the two sections, and think the decision in *Den* v. *Hopper* controls this question.

This follows from what we have said, that by the deed in question, Mrs. Adams is entitled to the use of the land during her natural life without the interference of her husband; that after her death her husband, if he survives her, will be tenant by the curtesy, and that the balance of the interest on the lands belongs absolutely in fee to Mrs. Adams' children.

The money is in court, and it is our duty to pay it out as nearly as may be, as if it were the land itself. I know of no better way than to let the value of Mrs. Adams' interest be calculated by the clerk, and said amount paid over to her. The same as respects Mr. Adams' interest, and the amount paid over to Mr. Ross. That the balance be invested under the supervision of the clerk, and the interest paid annually to the guardian of the children of Mr. Adams until the further order of this court.

*Reversed Adams* v. *Rose*, 1 *Vr.* 505; *Cited in Naylor* v. *Field*, 5 *Dutch.* 292; *Horner* v. *Webster, Ex.*. 4 *Vr.* 395, 405; *Johnson* v. *Cummins*, 1 *C. E. Gr.* 106; *Porch* v. *Fries*, 3 *C. E. Gr.* 208; *Black* v. *Del. & Rar. Can. Co.*, 7 *C. E. Gr.* 413; *Hayler's Ex.* v. *Atwood*, 11 *C. E. Gr.* 505.